# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of: )
) 
Common hallway outside 224 W. Washington, Milwaukee, ) Case No. 19-M-172
WI, Apartment #313, fully described in Attachment A )
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Common hallway outside 224 W. Washington, Milwaukee, WI, Apartment #313, fully described in Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Scott Marlow
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: July 16, 2019

*Judge's signature*

City and State: Milwaukee, Wisconsin — David E. Jones, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Scott Marlow, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since March 2006. Prior to my current assignment, I was employed as a police officer with the City of West Allis, a suburb of Milwaukee, Wisconsin for approximately nine (9) years. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. In the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, thefts, counterfeit crimes, forgeries, including cellular telephones and other electronic telecommunication devices.

3. I have had formal training in the investigation of drug trafficking; I have worked with numerous informants in the investigation of drug trafficking in the Milwaukee area; I have participated in the execution of numerous search warrants in which controlled substances, firearms, drug paraphernalia, and counterfeit monies were seized.

4. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

5. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6. Because this affidavit is submitted for the limited purpose of securing a

search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

7. For the reasons discussed herein, there is probable cause to believe that the premises located at and in the City and County of Milwaukee, more fully described in Attachment A, are items that constitute evidence of illegal narcotics possession and/or distribution, in violation of Title 21, United States Code, Sections 841 and 846.

## II. THE DRUG DETECTION CANINE

8. That affiant states that "Drug Detection Canines" are trained to detect the odor of controlled substances; that these substances include marijuana, cocaine, heroin, as well as other dangerous drugs due to chemical processing similarities; that upon location of the odor of these controlled substances, the dog's behavior will change; that the dog is trained to come to a final response of biting and/or scratching at the source of the odor; that this final response is called an **"Alert"**; furthermore, this final response or **"Alert"** may also indicate items recently contaminated with, or associated with, the odor of one or more of the controlled substances;

9. That affiant further states that when a dog is trained to detect a substance, it learns to discriminate the odor vapor of that substance from other odors in the environment by reacting to the compound(s) that best help it earn reinforcement from the drug detection canine handler; that with sufficient training, the compound(s) whose detection most often results in reinforcement becomes the "odor detection signature";

### FLORIDA -v- JARDINES

10. That affiant is also aware of the recent Supreme Court decision in *Florida -v- Jardines* that a police officer's use of a trained narcotics detection canine at the front door of a home to reveal details inside that home, which the officer is unable to discover using the officer's ordinary powers of perception without a physical intrusion into the home, is a Fourth Amendment search requiring a warrant based on probable cause; that without a warrant a dog sniff was a governmental intrusion into the curtilage of a home and constitutes a search within the meaning of the Fourth Amendment because special

protection is offered to the home and that the police violated *Jardines'* expectation of privacy by unlawfully entering his property without a warrant based on probable cause;

11. That affiant is further aware that the United States Supreme Court subsequently also held that the government's use of trained police dogs to investigation a home and/or apartment, and its immediate surroundings, is a "search" within the meaning of the Fourth Amendment; that in so holding, the Court relied on the special protections afforded to the home and the apartment dweller and the area immediately surrounding their home and/or their apartment, that is, the curtilage; that the Court went on to explain that while the knocker on the front door is treated as an invitation or license to attempt entry justifying ingress to the home by solicitors, hawkers and peddlers of all kinds, it does not extend to a trained police dog to explore the area around the home in hopes of discovering incriminating evidence.

### III. PROBABLE CAUSE

12. In August of 2017, case agents initiated an investigation into the Jimmy BATES Drug Trafficking Organization (DTO). As part of the investigation, case agents have interviewed several confidential sources and have utilized one confidential source to complete three controlled purchases of heroin from BATES. As a result of the intelligence provided by the confidential sources and the controlled purchases, along with information obtained from other law enforcement officers, case agents have learned that BATES obtains kilogram amounts of heroin from several known and unknown sources of supply, and is the leader of a large-scale heroin distribution network operating in the Milwaukee metropolitan area.

13. In August and September of 2017, case agents interviewed a confidential source (CS #1). CS #1 stated that s/he is in state custody for drug trafficking charges, including a heroin overdose death. CS #1 identified his source of supply of heroin as being Jimmy Bates, aka "Big Jim," or "Homie." CS #1 stated that BATES would charge $90 per gram of heroin and that CS #1 had bought up to 200 grams of heroin at a time from BATES. CS #1 stated that s/he had observed at least three "bricks" (kilograms) of heroin at one of BATES' stash houses located at North 43rd and Burleigh Street in the

City of Milwaukee. CS #1 stated that BATES is smart and switches up his stash houses often. CS #1 stated that BATES had a 2012 Audi A7 that is a Christmas red and green custom color/paint job and that he also drives rental vehicles often. CS #1 stated that BATES has several associates, including "Big Nash," Justin STAMPS, Jesse aka "Budda," Willie Jordan, and Devon Wooten.

14. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since August of 2017. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including information from other sources. CS #1 is in state custody for drug trafficking charges, including a heroin overdose death and is cooperating for consideration on those charges. CS #1 has a prior conviction for delivery of heroin. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS #1 to be reliable.

15. On multiple occasions since February of 2018, case agents interviewed a confidential source (CS #3). CS #3 provided information regarding individuals who were involved in moving substantial amounts of heroin and cocaine in the Milwaukee area, including Jimmy BATES. CS #3 stated that Snowball, Juan, Howie, and Cameron Dowell were all members of BATES' drug trafficking organization in Milwaukee. CS #3 stated that BATES used to sell cocaine and heroin but was now strictly in the heroin business. CS #3 stated that it is not uncommon for BATES to pick up 4 kilograms of heroin at a time from his supplier in Chicago. CS #3 states that BATES pays $70,000-$75,000.00 per kilogram of heroin and cuts it up before selling it in Milwaukee.

16. For several reasons, case agents believe that CS #3 is reliable and credible. First, CS #3 has been providing information since February of 2018. Second, the information provided by CS #3 is substantially against his/her penal interests. Third, the

information provided by CS #3 is consistent with evidence obtained elsewhere in this investigation where CS #3 was not utilized, and substantial portions of CS #3's information has been corroborated through independent investigation, including information from other sources and law enforcement reporting. CS #3 is cooperating for potential consideration on federal drug trafficking charges. CS #3 has a prior felony conviction for second-degree reckless homicide. For these reasons, case agents believe CS #3 to be reliable.

17. On September 28, 2018, case agents utilized CS #3 to conduct a controlled purchase of 125 grams of heroin from BATES for $7,000.00. Prior to the controlled buy, CS #3 and his/her vehicle was searched for contraband, rendering negative results. Prior to the controlled buy, CS #3 placed several recorded telephone calls to cellular telephone number 601-918-1212, and BATES instructed CS#3 to meet him at a specific location. Case agents observed CS #3 meet with BATES, who ultimately conducted the transaction with CS #3 for 125 grams of heroin. During the controlled buy, BATES discussed that he was supplying CAIN with 200 grams of heroin, and packaged the heroin for CAIN in front of CS #3. After CS #3 obtained the heroin from BATES, case agents observed CAIN come to the "stash" house and meet with BATES. After the controlled buy, case agents met with CS #3 and seized the heroin and the recording devices. Case agents reviewed the recording device utilized by CS #3 to confirm CS #3's purchase of heroin from BATES. Case agents field tested the heroin with positive results.

18. On March 27, 2019, case agents met with CS #3 in anticipation to conduct a controlled purchase of two firearms and a ballistic vest from BATES. Prior to the meeting CS #3 and CS #3's vehicle was searched with negative results. CS #3 was given $2,000.00 in official funds, and a video/audio recording device. CS #3 left the neutral location and met with BATES. Case agents maintained surveillance of BATES as he and CS #3 travelled to several different identified locations utilized by the BATES DTO. As case agents were maintaining surveillance of BATES, they observed BATES and CS #3 travel to 3251 N. 28 St, Milwaukee, WI. As case agents were surveilling the residence, case agents observed BATES exit the residence with a suitcase and place the suitcase in the

rear of CS #3's vehicle. A short time later, case agents observed CS #3 exit the residence, where he/she met with investigators at a pre-determined neutral location. Case agents took custody of the video/audio recording device and seized a camouflage ballistic vest, a Bushmaster .223 semi-automatic rifle, and a Smith & Wesson .40 caliber semi-automatic pistol.

19. On April 17, 2019, case agents met with CS #3 to conduct a controlled purchase of 100 grams of heroin from BATES. BATES instructed CS #3 to meet him at 3251 N. 28 St, Milwaukee, WI to conduct the transaction. Case agents established surveillance of the residence and observed an individual named Anthony MEEKS waiting on the front porch of the residence. Case agents observed Paul PARKER exit the residence through the front door and drive away in a white Buick sedan and drive away from the area. Case agents observed PARKER return a short time later. While CS#3 was inside the residence, investigators observed CS #3 and MEEKS exit the residence through the rear/side entry door and walk towards the detached garage. Case agents observed BATES exit the detached garage, and greet PARKER and CS #3. Case agents observed BATES, MEEKS, and CS #3 re-enter the residence through the rear/side entry door. Investigators observed CS #3 exit the front door of the residence and drive away from the area. Shortly after CS #3 left the residence, case agents observed PARKER also leave the residence and drive away from the area. Case agents met CS #3 at a pre-determined location, where CS #3 and his/her vehicle were searched rendering negative results and case agents seized the recording devices. CS #3 also provided case agents with a package containing approximately 100 grams of suspected heroin.

20. On May 19, 2019, BATES and Anthony MEEKS were arrested by the Milwaukee Police Department as a result of a burglary investigation at 5112 N. 40 St, Milwaukee, WI. MEEKS was taken into custody outside the residence. A search incident to arrest resulted in the seizure of three small individual baggies of suspected crack cocaine from MEEKS. BATES was taken into custody as he was walking outside the residence. A search of BATES resulted in the seizure of $7,340.25 in U.S. currency. A search of the residence resulted in the seizure of a .25 caliber handgun, a ballistic vest,

and a digital scale with residue. Both BATES and MEEKS were taken into custody and detained at the Milwaukee County Criminal Justice Facility. On May 25, 2019, BATES and MEEKS were released pending charges by the Milwaukee County District Attorney's Office.

21. In the September 2018, case agents debriefed CS #3 who stated that he/she was with BATES when they entered 901 W. Winnebego #134, Milwaukee, WI and CS #3 met a girlfriend of BATES, later identified as Shakiya MCBRIDE, (dob: 03/21/1997). CS #3 stated that BATES utilizes MCBRIDES' address to store a firearm, heroin and marijuana inside the apartment. On July 2, 2019, case agents were monitoring court authorized electronic monitoring of BATES' cellular telephone. As a result of the electronic monitoring, case agents observed that BATES' cellular telephone was at **224 W. Washington, Milwaukee, WI**. Case agents established surveillance of **224 W. Washington, Milwaukee, WI** and observed BATES exit the south door, enter his vehicle and drive away from the area. Additional electronic monitoring revealed that the cellular telephone utilized by BATES was located at **224 W. Washington, Milwaukee, WI** on multiple occasions over the past three weeks, and has last been located at **224 W. Washington, Milwaukee, WI** on July 14, 2019.

22. Case agents made contact with the building management and maintenance and the building management confirmed that MCBRIDE resides in apartment #313 of **224 W. Washington, Milwaukee, WI,** and established residency on June 1, 2019. On July 16, 2019, case agents showed a maintenance employee, M.P., at **224 W. Washington, Milwaukee, WI** a photograph of BATES. M.P. stated that he has seen BATES inside **224 W. Washington, Milwaukee, WI** several times over the past several weeks. M.P. also stated that **224 W. Washington, Milwaukee, WI** has the ability to let residents remotely allow guests to enter the main common locked door via cellular telephone, and the apartment door lock is a four (4) digit code. M.P. stated that MCBRIDE is rarely at the apartment, only several times a week.

23. On July 16, 2019, case agents interviewed Tania Perez, one of BATES' girlfriends who resides at 4463 N. 73rd Street. Ms. Perez stated that she ordered BATES

to remove all of his items from her residence approximately 3 weeks ago. Based upon their training and experience and the investigation to date, case agents believe that given that MCBRIDE is rarely at the apartment, BATES is actually in control of apartment #313 at **224 W. Washington, Milwaukee, WI**, and is using MCBRIDE to rent the apartment to attempt to evade law enforcement.

## CANINE HANDLER AND CANINE TRAINING AND EXPERIENCE

24. SA Marlow knows that Police Officer Christopher CONWAY of the Milwaukee Police Department's HIDTA-Interdiction Unit is the current handler of the Drug Detection Canine "FLEXY" and that Police Officer Christopher CONWAY and "FLEXY" have received four weeks (160 hours) of intensive training and certification through Shallow Creek Kennels, deploying and utilizing a drug detection canine; that this certification is based on guidelines set forth by the North American Police Work Dog Association (NAPWDA) which is a nationally based group in partnership with local, state, federal and international agencies including private vendors, law enforcement and first responder; that this training establishes consensus-based best practices for the use of detection canine teams by improving the consistency and performance of deployed teams which will improve interdiction efforts as well as courtroom acceptance.

25. That Det. Conway has explained to SA Marlow that Shallow Creek Kennels utilizes independent evaluators to certify each drug detection canine team; that these evaluators that certified Drug Detection Canine "FLEXY" have been certifying drug detection canines since the year 2004; that the first evaluator and owner is John Brannon. John Brannon's career in Law Enforcement spans a 24 year period with 22 years having been spent as a K9 officer working 5 dual purpose Police Service Dogs. For approximately, 20 years John was employed by the Coral Springs Police Department, Broward County Florida where he was responsible for all the day to day operations of the K9 unit. Additionally, while with Coral Springs, John was an active Special Response Team member and the S.R.T canine team leader. John is a certified State of Florida K9 Instructor since 1993 and is a Florida Department of Law Enforcement Trainer Evaluator. In 2004, John established Shallow Creek Kennels located in Sharpsville, Pennsylvania.

Shallow Creek Kennels is an Ohio Peace Officer's Training Academy and Florida Department of Law Enforcement certified training facility. John's professional membership include: Master Trainer for the North American Police Work Dog Association and past President of Pennsylvania Police Work Dog Association.

26. P.O. Conway also explained to SA Marlow a second evaluator is Jeremy Riley. Jeremy entered the United States Army, where he served 5 years as a Military Working Dog Handler. During his Military career he worked two dual purpose military working dogs achieving the rank Specialist and was deployed to Korea as well as Bosnia. He then became a police canine handler for the Henderson County Sheriff's Office in North Carolina where he worked 3 dual purpose police service dogs for 11 years. Jeremy was his agency's unit trainer. Jeremy Riley is also a member of the North American Police Working Dog Association.

27. P.O. Conway explained a third evaluator is Mike Van Leer who became a State Certified Canine Instructor for the Florida Highway Patrol in 1993. He then became the first and only current State Certified Evaluator for the Florida Highway Patrol in 1996. He is the first canine trainer/evaluator in the State of Florida qualified to teach and certify narcotic detection canines under a national program, the International Forensic Research Institute at Florida International University. As a canine instructor/evaluator, Trooper Van Leer has trained over 65 police canine teams in the areas of narcotic detection, tracking and patrol work. Trooper Van Leer has over 2,000 academic hours in the training of Police Working Dogs.

28. That affiant further states that Police Officer Christopher CONWAY is the current handler of the Drug Detection Canine **"FLEXY"** and that **"FLEXY"** is trained to detect the odor of controlled substances; that these substances include marijuana, cocaine, heroin, methamphetamine, etc., as well as other dangerous drugs due to chemical processing similarities; that upon location of the odor of these controlled substances, the dog's behavior will change; that the dog is trained to come to a final indication or response of a sit at the source of the odor; that this final indication or response is called an **"Alert"**; furthermore, this final indication or response or **"Alert"** may also indicate

items recently contaminated with, or associated with, the odor of one or more of the controlled substances;

29. SA Marlow further states, according to Police Officer Christopher CONWAY, the current handler of the Drug Detection Canine **"FLEXY"**, that when a dog is trained to detect a substance that it learns to discriminate the odor vapor of that substance from other odors in the environment by reacting to the compound(s) that best help it earn reinforcement from the drug detection canine handler; that with sufficient training, the compound(s) whose detection most often results in reinforcement becomes the "odor detection signature";

30. SA Marlow states, according to Police Officer Christopher CONWAY, that his Drug Detection Canine "FLEXY" has detected controlled substances more than "200" times in the past which included training; that in each alert drugs that "FLEXY" is trained to find have been recovered or a drug nexus has been found; that "FLEXY" alerts have been the basis for seven (7) search warrants and the search of motor vehicles; that in each alert, drugs that "FLEXY" is trained to find have been recovered or a drug nexus has been found; that the canine has been used in these motor vehicle searches during training and in the execution of search warrants in the past and that during these searches the canine has located controlled substances for the officers resulting in the arrest and issuance of charges pending against these individuals;

31. Based on the above information, there is probable cause to believe that the items described in Attachment B, which are evidence of violations of Title 18 U.S.C. § 1956 and 1957 and Title 21, U.S.C. Sections 841 and 846, as well as contraband, fruits of a crime, or other items illegally possessed are located at **224 W. Washington, Milwaukee, WI**, therefore request that this court issue a warrant to search **224 W. Washington, Milwaukee, WI** and to seize the items specified in Attachment B.

## ATTACHMENT A
### *Location to be Searched*

224 W. Washington, Milwaukee, WI is a red bricked, multi-unit apartment building. Apartment #313 is located on the third floor, with the door facing south, of a common hallway. The numerals 224 are located on a glass door on the south side of the building. The numerals 313 are on a place card to the left of the apartment entrance door.



# ATTACHMENT B
## *Items To Be Searched*

A. The odor vapor of the following controlled substances which can be detected by the drug detecting K-9, emanating from the target apartment.

   1. The odor of Marijuana – a greenish plant like substance
   2. The odor of cocaine – a white, powdery or off-white chunky substance
   3. The odor of heroin – a tan or grey, chunky and/or powdery substance
   4. The odor of fentanyl – a white, powdered or chunky substance
   5. The odor of methamphetamine – a clear or off-white substance with a "glass-like" appearance.

B. This warrant does not authorize the seizure of any tangible property.